UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER HENYARD, | ) | |
| | ) | |
| Petitioner, | ) | 15 C 2324 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| KIMBERLY BUTLER, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

**M**EMORANDUM **O**PINION AND **O**RDER

Christopher Henyard, who is serving a life sentence for first degree murder and a thirty-

year term for armed robbery in Illinois state prison, petitions for a writ of habeas corpus under 28

U.S.C. § 2254. Doc. 7. Henyard seeks habeas relief on five grounds: (1) that the trial court

improperly allowed two witnesses to testify about their prior consistent statements; (2) that the

prosecutor withheld from the defense an enhanced version of a surveillance video of the crime;

(3) that his appellate counsel was ineffective for failing to argue that his trial counsel was

ineffective for persuading him not to testify; (4) that the indictment was substantially amended

without being resubmitted to the grand jury; and (5) that the prosecutor knowingly relied on

perjured testimony. Henyard's petition is denied, and the court will not issue a certificate of

appealability.

**Background**

A federal habeas court presumes that the state courts' factual findings are correct unless

they are rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Jean-Paul v.

Douma*, 809 F.3d 354, 360 (7th Cir. 2015) ("A state court's factual finding is unreasonable only

if it ignores the clear and convincing weight of the evidence.") (internal quotation marks

omitted); *Coleman v. Hardy*, 690 F.3d 811, 815 (7th Cir. 2012) ("We give great deference to state court factual findings. After AEDPA, we are required to presume a state court's account of the facts correct, and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence.") (internal quotation marks omitted). The Appellate Court of Illinois is the last state court to have adjudicated Henyard's case on the merits. *People v. Henyerd*, 2013 IL App (1st) 112293-U (Ill. App. Nov. 8, 2013) (unpublished order) (reproduced at Doc. 20-25); *People v. Henyerd*, No. 1-08-0468 (Ill. App. Aug. 12, 2010) (unpublished order) (reproduced at Doc. 20-20). (The state court spelled his name, "Henyerd.") The following sets forth the facts as that court described them, as well as the procedural background of the state criminal and post-conviction proceedings.

### A.      Factual Background and Trial

Nick Martini, who owned Blue Ribbon Food Store, a grocery and liquor store at the corner of Roosevelt Road and Whipple Street in Chicago, was shot to death during a robbery on October 12, 1992. Doc. 20-20 at 2. In 1995, Henyard was convicted of first degree murder and armed robbery for his participation in the crimes, but the convictions were reversed on appeal in 1998. *Ibid.* In a second trial, Henyard was convicted again, but in 2003 the convictions once again were reversed on appeal. *People v. Henyerd*, 1-00-1717 (Ill. App. 2003) (unpublished order) (reproduced at Doc. 20-1 at 33-77), *appeal denied*, 806 N.E.2d 1069 (Ill. 2003). In 2008, Henyard was tried and convicted for a third time. Doc. 7 at 1. Unless otherwise specified, the facts and testimony described below refer to Henyard's third trial.

The key prosecution witness at trial was Milton Sims, a Blue Ribbon employee who was present when Martini was shot. Sims testified that he arrived at work shortly after 6:00 a.m. on October 12, 1992, and as he began to water down the produce, a man wearing a ski mask

grabbed him, placed a gun to his neck, and directed him behind the counter. Doc. 20-20 at 2. Sims identified the man as Joseph Dixon, whom Sims knew from childhood. *Id*. at 2-3. Sims saw a second man, also wearing a ski mask and carrying a gun, standing behind Martini and rummaging through the store's safe. *Id*. at 3. Sims identified that man as Henyard, with whom Sims had grown up in the neighborhood. *Ibid*. Martini and Henyard struggled, Sims heard a gunshot, Martini fell with what proved to be a fatal wound to his back, and Henyard and Dixon left the store. *Ibid*.

A convicted felon, Sims had worked periodically at Blue Ribbon since 1983. *Ibid*. On several occasions he had been fired for stealing money, but Martini had rehired him repeatedly, including in October 1992, shortly before the murder. *Ibid*. Sims testified that in August 1992, Dixon approached Sims, told Sims that he was going to rob Blue Ribbon, and asked Sims detailed questions about Blue Ribbon's hours and security, which Sims answered. *Id*. at 3-4. On October 9, 1992, three days before the robbery, Henyard and Dixon approached Sims and asked about Blue Ribbon's security, when the store opened, how early staff arrived, and whether the store received deliveries. *Id*. at 4. After Sims answered those questions, either Henyard or Dixon told Sims that they would give him some money after they robbed the store; Sims, however, did not believe that the men would actually rob the store or kill Martini. *Ibid*.

On October 12, 1992, when the police arrived at Blue Ribbon after Martini's murder, Sims did not tell them that he knew who the perpetrators were. *Ibid*. Sims returned to store two days later and spoke to a detective, who took him to the police station, where he gave a court-reported statement. *Ibid*. Sims was eventually charged (along with Henyard and Dixon) with the robbery and Martini's murder, but he was acquitted in August 1994. *Ibid*. At his own trial, Sims unsuccessfully moved to suppress his statements, claiming that the officers had coerced the

statements by handcuffing him to a wall and beating him. *Id*. at 4-5. At Henyard's first trial, in 1995, Sims similarly testified that his statements were coerced and that he did not know who committed the crimes. *Id*. at 5. At Henyard's third and final trial, however, Sims testified that his coercion claims—both at his own 1994 trial and at Henyard's 1995 trial—were false, and that he had made those claims because he was afraid of being convicted and imprisoned. *Ibid*. At the 2008 trial, Sims further testified that his current testimony was truthful because an innocent man (Martini) had been killed and because Sims since the 1995 trial had successfully completed a rehabilitation program and was now working steadily. *Ibid*.

Defense counsel extensively cross-examined Sims about his testimony that his previous testimony was perjured. *Id*. at 7. Sims admitted that he had lied under oath both at his own trial and at Henyard's first trial; that when Blue Ribbon was robbed, Sims was on probation and faced a risk of imprisonment; and that in 1995, he had received another sentence of probation after pleading guilty to violating his earlier probation. *Ibid*. Although Sims denied that he expected Henyard and Dixon to pay him for the information that he provided about Blue Ribbon before the robbery, defense counsel impeached him with his testimony from Henyard's second trial, in 2000, where he testified that he had expected to be paid. *Ibid*. Similarly, although at the 2008 trial Sims testified that he was not handcuffed when he met with the officers at the police station two days after the robbery and murder, defense counsel impeached him with his 2000 testimony that the police brought him to the station in handcuffs. *Ibid*.

On redirect examination, and over a defense objection, the trial judge permitted the prosecution to ask Sims about his prior consistent statements, including his court-reported statement two days after the robbery. *Id*. at 8. In that statement, Sims described his first meeting with Dixon, his meeting with Dixon and Henyard where they discussed store security, and his

recognition of Henyard during the robbery. *Id*. at 8. The prosecutor read portions of the statement back to Sims, elicited his agreement that he had made those statements, and introduced the entire statement through the testimony of an assistant state's attorney who obtained the statement. *Ibid*. On re-cross-examination, Sims admitted that at Henyard's 1995 trial he testified that: (1) he could not recognize either assailant at Blue Ribbon; (2) the detectives asked him to state falsely that he could recognize Henyard's facial features through the robber's ski mask; (3) the officers questioning him at the station pushed him against a wall, kneed him in the groin, and told him that they knew who had committed the crimes but needed him to provide details; and (4) the August 1992 meeting with Dixon did not occur. *Id*. at 8-9.

In addition to Sims's testimony, the prosecutor introduced evidence that at about 6:00 a.m. on the day of the robbery, Herschel Brown, the manager of a car wash a block from Blue Ribbon, saw a car resembling Dixon's pull into the car wash and then drive in the direction of Blue Ribbon. *Id*. at 5. Brown testified that he then saw Henyard and Dixon on the sidewalk about 100 feet from Blue Ribbon. *Ibid*. Brown identified Henyard and Dixon in lineups and in court, and he identified Dixon's car. *Ibid*. Martini's nephew, who also witnessed the crime, *id*. at 3, identified a striped ski mask found in Dixon's car as having been worn by one of the assailants at Blue Ribbon. *Id*. at 6.

The prosecutor also presented Devada Burns, a self-admitted alcoholic and drug user who at the time of his testimony was serving a sentence for forgery, which was to be followed by a federal prison term for a drug conviction. *Ibid*. Burns testified that in early October 1992, before the robbery, Henyard approached him in an alley in the same area and asked if he had a pistol. *Ibid*. Henyard told Burns that he had robbed Anna's Food and Liquors, a different store in the neighborhood, and that Blue Ribbon would be next. *Ibid*.

On cross-examination, Burns admitted that during the time period when Henyard spoke to him about the robberies, Burns would frequently drink alcohol "all day long," but he denied that he was drunk when Henyard spoke to him. *Id*. at 9. Defense counsel asked Burns if in 1999 the State had helped him resolve a criminal case in which he ultimately received probation; after a sidebar, the court instructed the jury that Burns had been represented by counsel in 1999, had entered into a negotiated guilty plea, and that nothing in the record suggested that the State had improperly disposed of that case. *Ibid*. Burns also testified that in 2000, but not in 1995, he had remembered the date on which he spoke to Henyard in October 1992; and that he thought, but was not sure, that he had told someone in 1992 that an individual named Andrew Young had also been in the alley when Henyard spoke to him about the robbery. *Id*. at 9-10.

On redirect examination, the prosecutor, over a defense objection, questioned Burns about prior consistent statements that he made at Henyard's 2000 trial, including that Henyard told him that he had "got" Anna's Food and Liquors and that he planned to rob Blue Ribbon next. *Id*. at 10. The prosecutor also elicited Burns's testimony that he related largely the same facts to the grand jury on October 19, 1992, and in a handwritten statement to an assistant state's attorney on October 16, 1992. *Ibid*. In addition, Muhammad Akrabawi, a former cashier at Anna's, testified that he was working at Anna's when Henyard robbed it on August 20, 1992, that he saw Henyard in the store on previous occasions, and that he identified Henyard during the Anna's robbery because of large eye holes in the ski mask. *Id*. at 6-7. Akrabawi had identified Henyard in a photograph and in a lineup, and also did so through an in-court identification at the trial. *Id*. at 7.

The trial judge told Henyard that the decision to testify was his alone, that his counsel could advise him on the issue but not decide it for him, and that if he chose not to testify, the jury

would be instructed that his lack of testimony could not be used against him. Doc. 20-12 at 118. Henyard indicated that he understood and chose not to testify. *Ibid*.

The jury convicted Henyard of armed robbery and first degree murder, and the trial court sentenced him to thirty years imprisonment and life imprisonment, respectively. Doc. 7 at 1.

**B.      Direct Appeal and Post-Conviction Review**

Henyard appealed, arguing that: (1) the prosecutor improperly elicited testimony about Sims's and Burns's prior consistent statements; (2) he was prejudiced when a defense expert witness was not permitted to testify fully about outdoor lighting and meteorological conditions at the time of the robbery/murder; and (3) the trial judge repeatedly displayed hostility toward the defense during trial. Doc. 20-17 at 6. The state appellate court affirmed. Doc. 20-20. As to the first argument (the only one relevant here), the court reasoned that "a prior consistent statement of a witness may be introduced to rehabilitate the witness by rebutting a claim of recent fabrication when that prior consistent statement was made before the alleged recent fabrication," and that "defense counsel in her impeachment of" Sims and Burns "was suggesting that they had recently fabricated their testimony." *Id*. at 10. Henyard then filed a petition for leave to appeal ("PLA") with the Supreme Court of Illinois, pressing the claim about Sims's and Burns's prior consistent statements. Doc. 20-21. The PLA was denied. *People v. Henyerd*, 942 N.E.2d 458 (Ill. 2010) (reproduced at Doc. 20-22).

Meanwhile, in February 2010, Henyard filed a petition for relief from judgment pursuant to the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122-1 *et seq*. Doc. 20-16 at 11-15. The petition argued that the prosecutor presented at trial a different surveillance video than the video provided to the defense before trial, thereby denying Henyard a fair trial and "violat[ing] Illinois law and U.S. supreme court ruling," and also that his trial counsel was ineffective for failing "to

catch the state's misconduct." *Id*. at 13-14. In May 2011, prior to a ruling on that petition, Henyard filed another post-conviction petition. Doc. 20-15 at 71-77. That petition argued that: (1) Henyard's trial counsel was ineffective for "fail[ing] to ask for a continuance to investigate the State's [surveillance video] DVD, as well as the VHS given to the defense because the two were not the same," and for failing to object to the undisclosed evidence introduced through the testimony of a witness, *id*. at 72; (2) the prosecutor knowingly elicited perjured testimony from Sims and Detective Ann Chamber, *id*. at 73-74; (3) his appellate counsel was ineffective for failing to raise his trial counsel's ineffectiveness "for wrongfully advising and persuading [Henyard] not to testify" and for failing to produce a witness who would have refuted Burns's testimony, *id*. at 75; and (4) his appellate counsel was ineffective for failing to appeal the denial of his motion to dismiss the charges and his motion to suppress and for failing to raise prosecutorial misconduct, *ibid*. On June 28, 2011, the trial court dismissed both petitions. *Id*. at 133-48.

On appeal, Henyard's counsel moved to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987). Doc. 20-23. Henyard opposed the motion. Doc. 20-24. The state appellate court, finding "no issues of arguable merit to be raised on appeal," affirmed the dismissal of Henyard's two post-conviction petitions and granted his appellate counsel's motion to withdraw. Doc. 20-25. Henyard filed a PLA, pressing only the claim that appellate counsel was ineffective for failing to argue that trial counsel was ineffective for persuading Henyard not to testify. Doc. 20-26. The state supreme court denied leave to appeal. *People v. Henyerd*, 5 N.E.3d 1126 (Ill. 2014) (reproduced at Doc. 20-27).

Henyard filed another post-conviction petition on September 30, 2014, which the trial court denied on December 5, 2014. Doc. 8 at 2. Henyard appealed, and during the pendency of

that appeal he timely filed this federal habeas petition. Doc. 1; Doc. 19 at 5 n.3. The court then denied Henyard's motion to stay these proceedings pending that appeal. Doc. 15.

**Discussion**

As noted, Henyard's habeas petition asserts five grounds for relief: (1) that the trial court improperly allowed two witnesses to testify about their prior consistent statements; (2) that the prosecutor withheld from the defense an enhanced version of a surveillance video of the crime; (3) that his appellate counsel was ineffective for failing to argue that his trial counsel was ineffective for persuading him not to testify; (4) that the indictment was substantially amended without being resubmitted to the grand jury; and (5) that the prosecutor knowingly relied on perjured testimony. Doc. 7. (The fifth claim appears in the petition as part of the first claim, but it states a distinct claim.) Earlier in this case, the court held that the fourth claim was meritless because the Fifth Amendment's grand jury clause does not apply to the States, and a habeas petitioner cannot seek federal habeas relief based on an alleged violation of state law. Doc. 15. As shown below, the second and fifth claims are procedurally defaulted, and the first and third claims fail on the merits.

## I.    Procedurally Defaulted Claims

A federal habeas claim is "procedurally defaulted when a petitioner fails to 'fairly present' his claim to the state courts." *Richardson v. Lemke*, 745 F.3d 258, 268 (7th Cir. 2014). "To fairly present his federal claim, a petitioner must assert that claim throughout at least one complete round of state-court review, whether on direct appeal of his conviction or in post-conviction proceedings." *Ibid.* (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). That means that the petitioner, on either direct or post-conviction review, must have "present[ed] the contention to each level of the state judiciary." *Bland v. Hardy*, 672 F.3d 445, 449 (7th Cir.

2012).  Accordingly, "[a] procedural default occurs where a habeas petitioner has exhausted his state court remedies without properly asserting his federal claim at each level of state court review."  *Crockett v. Hulick*, 542 F.3d 1183, 1192 (7th Cir. 2008) (internal quotation marks omitted).  In Illinois, exhaustion of remedies specifically requires presenting the claim to the Supreme Court of Illinois.  *See Boerckel*, 526 U.S. at 845-46.

The Warden argues, correctly, that Henyard procedurally defaulted his second and fifth claims.  Doc. 19 at 7.  The second claim contends that the State violated his Sixth Amendment right to a fair trial when the prosecution failed to disclose a video of the crime at Blue Ribbon; specifically, he submits that the video provided to his defense team was a poor quality VHS from 1992, and that the jury was shown an enhanced DVD.  Doc. 7 at 5, 12.  The fifth claim contends that Henyard's fair trial right was violated because the prosecutor knowingly relied on perjured testimony "to cover up the fact that [Henyard] was arrested without a warrant in his home by force and before any of the witnesses in this case implicated petitioner in" the robbery and murder.  *Id*. at 5, 11.  Neither of those claims was presented in either of Henyard's PLAs.  Docs. 20-21, 20-26.  It follows that the claims are procedurally defaulted.  *See Crockett v. Butler*, 807 F.3d 160, 166 (7th Cir. 2015) ("Crockett presented his Confrontation Clause claim to the Illinois Appellate Court but did not seek review by the Supreme Court of Illinois.  Under [*Boerckel*], that means Crockett has procedurally defaulted this claim."); *Rodriguez v. Scillia*, 193 F.3d 913, 917 (7th Cir. 1999) (finding procedural default where the petitioner raised a claim in the state appellate court but not in his PLA); *Norfleet v. Ryker*, 2013 WL 3482190, at *5 (N.D. Ill. July 11, 2013) (finding procedural default where the petitioner "failed to fairly present his Fourth Amendment claim to the state supreme court").

Henyard contests the procedural defaults on several grounds, all of which fail to persuade. He argues that when the state appellate court considered and affirmed the dismissal of his post-conviction petitions and granted his appellate counsel's motion to withdraw, the court ruled on the merits of the second and fifth federal habeas claims. Doc. 23 at 12-13. Henyard is correct that the appellate court's affirmance of a dismissal of a post-conviction petition "render[s] a merits judgment as to each of the claims raised in that petition." *Wilkinson v. Cowan*, 231 F.3d 347, 352 (7th Cir. 2000). But to avoid procedural default, Henyard had to present those issues in a PLA, and he did not do so. *See Boerckel*, 526 U.S. at 845-46.

Henyard next argues that he in fact did raise the prosecutorial misconduct claims at each level of state court review, but that he did so "in the context of Appellate Counsel and Trial Counsel errors." Doc. 23 at 16. Specifically, he asserts that because the second and fifth claims "raise[] issue(s) of [the] violation of state and federal constitutional rights," his asking the state supreme court in his post-conviction PLA "to review whether his constitutional contentions [were] 'patently without merit'" alleged facts that "within mainstream constitutional litigation" would be fairly understood to refer to the fair trial violations now asserted in his second and fifth federal habeas claims. *Ibid*.

Henyard's post-conviction PLA cannot be said to have fairly raised the second and fifth federal habeas claims. To fairly present a federal claim, a petitioner must supply the state court with "both the operative facts and the 'controlling legal principles'" underlying the claim, *Verdin v. O'Leary*, 972 F.2d 1467, 1474 (7th Cir. 1992) (quoting *Picard v. Connor*, 404 U.S. 270, 277 (1971)), and must alert the state court to the claim's "federal nature." *Baldwin v. Reese*, 541 U.S. 29, 30-31 (2004). Fair presentment "does not require a hypertechnical congruence between the claims made in federal and state courts; it merely requires that the factual and legal substance

remain the same." *Anderson v. Benik*, 471 F.3d 811, 814-15 (7th Cir. 2006). Four factors govern whether a federal petitioner fairly presented his claim in state court: "1) whether the petitioner relied on federal cases that engage in a constitutional analysis; 2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; 3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and 4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation." *Ellsworth v. Levenhagen*, 248 F.3d 634, 639 (7th Cir. 2001); *see also Byers v. Basinger*, 610 F.3d 980, 985 (7th Cir. 2010); *White v. Gaetz*, 588 F.3d 1135, 1139 (7th Cir. 2009); *Anderson*, 471 F.3d at 815.

Henyard's post-conviction PLA did rely on federal cases that engage in constitutional analysis. Doc. 20-26 at 9-12, 15  But those cases, mirroring the arguments of the PLA itself, concerned when claims may be dismissed as frivolous or without merit, *see Denton v. Hernandez*, 504 U.S. 25, 32-34 (1992); *Neitzke v. Williams*, 490 U.S. 319, 324-26 (1989), and ineffective assistance of counsel, *see Strickland v. Washington*, 466 U.S. 668 (1984)—not prosecutorial misconduct of any sort, much less the misconduct alleged in Henyard's second and fifth federal habeas claims. Likewise, although the PLA relied on Illinois state cases that engage in constitutional analysis, *see People v. Flores*, 606 N.E.2d 1078, 1085 (Ill. 1992) (discussing *McCleskey v. Zant*, 499 U.S. 467 (1991)), those cases did not address claims anything like Henyard's present prosecutorial misconduct claims. The PLA's statement of facts was limited to the procedural history of Henyard's post-conviction proceedings, and its discussion of his trial largely pertained to his disagreements with his trial counsel over whether he should testify. Doc. 20-26 at 5-7, 13-16. This calls to mind a specific constitutional right and is within the mainstream of constitutional litigation, but that right is the effective assistance of counsel, not the

right to a fair trial free from prosecutorial misconduct. In sum, none of the factors relevant to the fair presentation inquiry indicate that Henyard raised his second and fifth habeas claims to the state supreme court, and so those claims are procedurally defaulted.

A habeas petitioner may overcome a procedural default either by demonstrating cause for the default and actual prejudice, or by showing that the habeas court's failure to consider the claim would result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Smith v. McKee*, 598 F.3d 374, 382 (7th Cir. 2010). "Cause for a default is ordinarily established by showing that some type of external impediment prevented the petitioner from presenting his claim. Prejudice is established by showing that the violation of the petitioner's federal rights worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Thompkins v. Pfister*, 698 F.3d 976, 987 (7th Cir. 2012) (citations and internal quotation marks omitted). "The fundamental miscarriage of justice exception requires 'the habeas petitioner to show that a constitutional violation has probably resulted in the conviction of one who is actually innocent. To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him'" in light of some new evidence. *Smith*, 598 F.3d at 387-88 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

For cause and prejudice, Henyard contends that as a result of "overpopulation" at his state prison, he "was constructively denied access to Respondent's prison law-library." Doc. 23 at 17. Henyard explains that "access to relevant constitutional rules, case[] law, and statutes (contained in books) are limited to one or three books shared between 35 to 50 prisoners in a one hour and a half period," and "once a week it's a gamble to gain access to this legal material." *Id.* at 18. Henyard contends that this "denial of access" to the library violates *Bounds v. Smith*, 430

U.S. 817 (1977), and the Fourteenth Amendment, and that it constitutes prejudice because the Warden, who controls access to the law library, effectively prevented Henyard from developing his procedurally defaulted arguments in his PLA.  Doc. 23 at 18.

"This court examines claims of cause based on lack of access to a library on a case-by-case basis."  *Williams v. Buss*, 538 F.3d 683, 686 (7th Cir. 2008).  The court does not doubt that Henyard may not have had as much access to the law library as he wished.  But "*Bounds* did not create an abstract, freestanding right to a law library," and "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library … program is subpar in some theoretical sense."  *Lewis v. Casey*, 518 U.S. 343, 351 (1996).  Here, Henyard "does not explain why the lack of access to the library hindered his case" in such a way as to cause his procedural default.  *Buss*, 538 F.3d at 686.  Indeed, at every stage of this case in which he has proceeded *pro se*, including in this court, Henyard has filed extensive, cogent, citation-and quotation-filled briefs pressing multiple well-developed legal arguments.  Doc. 20-15 at 71-77 (post-conviction petition); Doc. 20-16 at 11-15 (first petition for relief from judgment); Doc. 20-24 (response in opposition to his post-conviction appellate counsel's motion to withdraw); Doc. 20-26 (second PLA); Doc. 23 (reply in support of his federal habeas petition).  This fatally undermines the notion that lack of access to legal materials caused Henyard to fail to raise his procedurally defaulted claims in his PLA.  Indeed, those claims were presented in Henyard's post-conviction petition, Doc. 20-16 at 72-74, so he did not need access to a library to renew and thereby preserve them in his PLA; he could simply have copied them from his petition.

Henyard also contends that his procedural default should be excused because "nothing in the record" alerted him that he had to raise his second and fifth claims to avoid procedural default.  Doc. 23 at 14.  This argument fails because a petitioner's *pro se* status in

state court does not excuse procedural defaults.  *See Haley v. United States*, 78 F.3d 282, 285 (7th Cir. 1996) ("Nor does Haley's pro se status excuse him from failing to argue the issue in his first petition.  Therefore, Haley has not established cause for failing to raise all of his claims in his first … petition."); *Salberg v. United States*, 969 F.2d 379, 383 (7th Cir. 1992) (holding in a habeas case that "Salberg's *pro se* status does not excuse his procedural defaults").  Henyard does not press the fundamental miscarriage of justice exception, so any such argument is forfeited.  *See Franklin v. Gilmore*, 188 F.3d 877, 884 (7th Cir. 1999) ("[P]rocedural default will be excused if a defendant can show that a failure to review the defendant's claims would result in a fundamental miscarriage of justice.  Franklin, however, does not make this argument and we will not make it for him.") (citation omitted).

## II.     Claims Considered on the Merits

The first and third habeas claims are not procedurally defaulted, so the merits must be addressed.  Because state courts have adjudicated those claims on the merits, they are subject to the standard codified in 28 U.S.C. § 2254(d).  "Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision 'was contrary to' federal law then clearly established in the holdings of th[e] [Supreme] Court, § 2254(d)(1); or that it 'involved an unreasonable application of' such law, § 2254(d)(1) … or that it 'was based on an unreasonable determination of the facts' in light of the record before the state court, § 2254(d)(2)."  *Harrington v. Richter*, 562 U.S. 86, 100 (2011) (citation omitted); *see also Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016); *Gilbert v. McCulloch*, 776 F.3d 487, 492 (7th Cir. 2015).

With respect to § 2254(d)(1), a state court's decision is "contrary to" clearly established federal law if the state court "applies the wrong legal standard established by Supreme Court

precedent or decides a case differently than the Supreme Court on materially indistinguishable facts." *Kamlager v. Pollard*, 715 F.3d 1010, 1015 (7th Cir. 2013) (citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). "Alternatively, a state court decision involves an 'unreasonable application of' federal law if the state court 'correctly identifies the governing legal principle … but unreasonably applies it to the facts of the particular case.'" *Kamlager*, 715 F.3d at 1015-16 (citing *Bell*, 535 U.S. at 694). To obtain relief under § 2254(d)(1), "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Wheeler*, 136 S. Ct. 456, 460 (2015). The "lack of a Supreme Court decision on nearly identical facts does not by itself mean that there is no clearly established federal law, since 'a general standard' from [the Supreme Court's] cases can supply such law," *Gilbert*, 776 F.3d at 491 (quoting *Marshall v. Rodgers*, 133 S. Ct. 1446, 1449 (2013)), but "a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e] [Supreme] Court's precedents." *Nevada v. Jackson*, 133 S. Ct. 1990, 1992 (2013) (internal quotation marks omitted).

As for § 2254(d)(2), "[a] state court's factual finding is unreasonable only if it ignores the clear and convincing weight of the evidence." *Jean-Paul*, 809 F.3d at 360 (internal quotation marks omitted). The court "may not characterize these state-court factual determinations as unreasonable merely because [it] would have reached a different conclusion in the first instance." *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015); *see also Jean-Paul*, 809 F.3d at 361. Rather, a "state court's factual determinations are cloaked with a presumption of correctness on federal habeas review, and the prisoner has the burden to rebut the presumption by clear and convincing

evidence." *Corcoran v. Neal*, 783 F.3d 676, 683 (7th Cir. 2015). For both prongs of § 2254(d), the relevant decision for purposes of this court's assessment is "the decision of the last state court to rule on the merits of [the petitioner's] claim." *Stern*, 812 F.3d at 609.

Henyard's first habeas claim argues that the state trial court unconstitutionally admitted Sims's and Burns's prior consistent statements when the prosecutor introduced them to rehabilitate Sims and Burns after cross-examination. Doc. 7 at 5, 8-10. Henyard contends that admission of the statements violated the Confrontation Clause and deprived him of due process. Doc. 23 at 4. The Warden responds that § 2254(d)(1) bars Henyard's claim. Doc. 19 at 6-7. The Warden is correct.

In *California v. Green*, 399 U.S. 149 (1970), the Supreme Court held that "the Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination." *Id*. at 158; *see also id*. at 164 ("[T]he Confrontation Clause does not require excluding from evidence the prior statements of a witness who concedes making the statements, and who may be asked to defend or otherwise explain the inconsistency between his prior and his present version of the events in question, thus opening himself to full cross-examination at trial as to both stories."); *United States v. Young*, 316 F.3d 649, 660 (7th Cir. 2002) (describing this principle as "well-settled law" and quoting *Green*); *United States v. Foster*, 652 F.3d 776, 787 (7th Cir. 2011) ("By implying that Anderson's plea agreement gave him an incentive to lie, Foster opened the door to the admission of Anderson's prior consistent statements."); *United States v. Anderson*, 450 F.3d 294, 302 (7th Cir. 2006) (noting that "prior consistent statements of a testifying witness are admissible" to bolster the witness's credibility). Nothing in the Supreme Court's more recent Confrontation Clause jurisprudence undermines this principle. *See*

*Crawford v. Washington*, 541 U.S. 36, 57 (2004) ("[P]rior trial or preliminary hearing testimony is admissible only if the defendant had an adequate opportunity to cross-examine.") (citing *Mancusi v. Stubbs*, 408 U.S. 204, 213-216 (1972)). Here, Henyard had and availed himself of the opportunity to cross-examine both Sims and Burns; indeed, the prosecutor introduced those witnesses' prior statements only after defense counsel had cross-examined them, and defense counsel then re-crossed Sims regarding the newly admitted prior consistent statements. Doc. 20-20 at 8-10. Henyard was not denied his confrontation right at all, as he had every "benefit of 'the principal means by which the believability of a witness and the truth of his testimony are tested'—subjecting that testimony to 'the crucible of cross-examination.'" *Jones v. Basinger*, 635 F.3d 1030, 1040 (7th Cir. 2011) (quoting *Davis v. Alaska*, 415 U.S. 308, 316 (1974), and *Crawford*, 541 U.S. at 61) (citation omitted).

Henyard retorts that *Green* is inapplicable because it concerned prior *inconsistent* statements rather than prior *consistent* statements. Doc. 23 at 3. But Henyard does not explain why that distinction matters under the Confrontation Clause. Moreover, Henyard presents no Supreme Court case that articulates a different standard for the admission of prior consistent statements. Rather, he relies on *People v. Henderson*, 568 N.E.2d 1234 (Ill. 1990), which notes that "[e]vidence of a prior consistent statement is inadmissible hearsay unless it has been suggested that a witness recently fabricated testimony or has a motive to testify falsely and the prior statement was made before the motive arose." *Id*. at 1259. *Henderson*'s discussion of prior consistent statements does not cite United States Supreme Court case law or the United States Constitution, and so does not provide a possible contrary standard to that articulated in *Green*. And *Henderson* is not a decision of the United States Supreme Court, and thus does not help Henyard under § 2254(d)(1).

Henyard find no more purchase with the due process portion of his first claim. Both the Federal Rules of Evidence and Supreme Court case law recognize that "[p]rior consistent statements that are offered to rebut a charge of recent fabrication or improper influence or motive are not hearsay." *United States v. Alviar*, 573 F.3d 526, 541 (7th Cir. 2009) (citing Fed. R. Evid. 801(d)(1)(B); *Tome v. United States*, 513 U.S. 150, 157-58 (1995)). "Such statements are admissible if they satisfy a four-part test: (1) the declarant testifies at trial and is subject to cross-examination; (2) his prior statement is indeed consistent with his trial testimony; (3) the statement is offered to rebut an explicit or implicit accusation of recent fabrication; and (4) the statement was made before the declarant had a motive to fabricate." *Ibid*. In affirming Henyard's conviction, the state appellate court, relying on Illinois cases and applying Illinois state law, applied a nearly identical test. Doc. 20-20 at 10 ("[A] prior consistent statement of a witness may be introduced to rehabilitate the witness by rebutting a claim of recent fabrication when that prior consistent statement was made before the alleged recent fabrication was made."). Accordingly, even if the Supreme Court's cases rest on federal constitutional principles rather than merely evidentiary principles, the appellate court's decision was not contrary to then-existing Supreme Court precedent; nor did it unreasonably apply such precedent.

Henyard makes two arguments in response, both unpersuasive. First, he argues that the appellate court unreasonably applied *Tome*. Doc. 23 at 8. In this, he is wrong, for *Tome* holds that "prior consistent statements a[re] nonhearsay only if they are offered to rebut a charge of recent fabrication or improper influence or motive." *Tome*, 513 U.S. at 157 (internal quotation marks omitted). That is precisely the test that the appellate court articulated and applied, and the court's application of that test was not unreasonable. Doc. 20-20 at 10. Second, Henyard argued in his first PLA that he had not charged Sims and Burns with recent fabrication but instead only

impeached their credibility, and that Sims and Burns had "different motive[s] to fabricate before ever making the prior consistent statement and … denie[d] receiving a benefit from the state in exchange for [their] … trial testimony."  Doc. 20-21 at 15.  But the state appellate court reasonably concluded that "[i]t is clear, upon review, that defense counsel in her impeachment of Milton Sims and Devada Burns was suggesting that they had recently fabricated their testimony inculpating" Henyard, Doc. 20-20 at 10, that their prior consistent "statements were properly admitted for rehabilitation," *id*. at 11, and that even if one or two of Burns's statements from 2000 "should not have been admitted, in light of the cumulative nature of this testimony, which mirrored consistent statements Burns made on two separate occasions in 1992, to a grand jury and in a court-reported statement, we would not find it to be reversible error."  *Id*. at 10.  Again, even if *Tome* was of constitutional dimension, which it is not, the state appellate court's decision is not contrary to or an unreasonable application of *Tome*.

Henyard's third habeas claim is that his appellate counsel on direct appeal was ineffective for failing to argue that his trial counsel was ineffective for persuading him not to testify.  Doc. 7 at 6.  The Sixth Amendment guarantees criminal defendants the right to the effective assistance of counsel.  *See Vinyard v. United States*, 804 F.3d 1218, 1224 (7th Cir. 2015) (citing *Strickland*, 466 U.S. at 684-86).  A petitioner can establish that his attorney was ineffective by showing both that (1) the attorney's performance was deficient and (2) that he was prejudiced as a result.  *See Carter v. Douma*, 796 F.3d 726, 735 (7th Cir. 2015).

For the first element, Henyard must show that his counsel's performance "'fell below an objective standard of reasonableness.'"  *Blackmon v. Williams*, 823 F.3d 1088, 1102-03 (7th Cir. 2016) (quoting *Strickland*, 466 U.S. at 688).  "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it

deviated from best practices or most common custom." *Makiel v. Butler*, 782 F.3d 882, 897 (7th Cir. 2015) (internal quotation marks omitted). "A court's scrutiny of an attorney's performance is 'highly deferential' to eliminate as much as possible the distorting effects of hindsight, and we 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Vinyard*, 804 F.3d at 1225 (quoting *Strickland*, 466 U.S. at 689); *see also Woods*, 136 S. Ct. at 1151 ("[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.") (internal quotation marks omitted). In affirming the denial of Henyard's post-conviction petition, the state appellate court "found that counsel's performance was not constitutionally deficient," and this court "must give AEDPA deference to that conclusion, upholding it so long as it is not objectively unreasonable." *Blackmon*, 823 F.3d at 1103. "When the claim at issue is one for ineffective assistance of counsel … AEDPA review is doubly deferential." *Woods*, 136 S. Ct. at 1151 (internal quotation marks omitted).

Henyard contends that his decision not to testify was not his "decision alone," that his "[trial] counsel was not truthful with" him and "told [him] that the state would impeach him with his prior background," and that his testimony "would interfere with [counsel's] trial strategy." Doc. 7 at 6. In his post-conviction PLA, Henyard elaborated that his trial counsel told him that if he testified, the prosecutor could reintroduce the possibility of seeking death penalty and that the judge might be less lenient in sentencing. Doc. 20-26 at 13-15. Henyard maintains that he "really wanted to tell his side of the story," *id.* at 14, and that it "was not until after the trial, that [he] found out that his counsel had deceived him." *Id.* at 15. Henyard has failed to show that the state courts were unreasonable in rejecting his claim that his appellate counsel was ineffective in foregoing an ineffective assistance challenge to trial counsel's advising him not to testify; the

reason is that he "cannot show that his [trial] counsel's advice … was unreasonable." *Rodriguez v. United States*, 286 F.3d 972, 983 (7th Cir. 2002).

"*Strickland* generally provides a presumption of strategic decision-making by counsel," *Mitchell v. Enloe*, 817 F.3d 532, 538-39 (7th Cir. 2016), and the "decision not to place the defendant on the stand is a classic example of a strategic trial decision." *United States v. Stuart*, 773 F.3d 849, 853 (7th Cir. 2014) (internal quotation marks omitted).  As the Warden emphasizes, Doc. 19 at 8, Henyard has not, either in state court or in his habeas petition, explained what his testimony would have been.  Moreover, he has not explained how it would have rebutted or otherwise undermined the evidence against him, or why his lawyer's advice that he not testify fell below an objective standard of reasonableness.  The mere fact that Henyard and his trial counsel apparently disagreed about whether Henyard should testify does not establish ineffective assistance, as "there is no constitutional right to be represented by an attorney who shares the defendant's belief as to the best trial strategy." *United States v. Taylor*, 128 F.3d 1105, 1108 (7th Cir. 1997).

The decision whether to exercise his right to testify was Henyard's alone to make, *see Rock v. Arkansas*, 483 U.S. 44, 52-53 (1987), and he knowingly waived that right, Doc. 20-12 at 118.  And although Henyard argues that this decision was not his alone, Doc. 7 at 6, he does not contend that his waiver was coerced or otherwise improper.  Instead, he details his and his trial counsel's disagreements over the issue, and acknowledges that while he "strongly felt that if he was allowed to testify, the jury would have understood" that he was innocent, he was persuaded that "to[o] much was at stake with his life on the line, just to testify."  Doc. 20-26 at 15.  That was a perfectly reasonable decision, and the detail of Henyard's discussion with his counsel demonstrates that he was well-informed on the issue—so when the trial judge told him that the

decision whether to testify was his alone and explained that his lawyer could not make the decision for him, Henyard's declining to testify was a knowing waiver. *See Stuart*, 773 F.3d at 853 ("[A]t trial, under scrutiny from the inquiring judge, he explicitly waived this right and acquiesced to counsel's strategy.").  In short, "nothing in" Henyard's petition or the state court records "suggests that counsel's advice not to testify was anything less than the best professional assistance." *Taylor v. United States*, 287 F.3d 658, 663 (7th Cir. 2002).

Because Henyard cannot satisfy the first *Strickland* element, his ineffective assistance claim fails.  *See Strickland*, 466 U.S. at 687 ("Unless a defendant makes both showings [deficient performance and prejudice], it cannot be said that the conviction … resulted from a breakdown in the adversary process that renders the result unreliable.").  Even if Henyard had satisfied the first element, however, he failed to satisfy the second.  For that element, Henyard must show "'a reasonable probability that, but for counsel's [allegedly] unprofessional errors, the result of the proceeding would have been different.'"  *Strickland*, 466 U.S. at 694; *see also Hinesley v. Knight*, __ F.3d __, 2016 WL 4758437, at *6 (7th Cir. Sept. 13, 2016) (citing the *Strickland* prejudice standard and noting that a "reasonable probability" is "a probability sufficient to undermine confidence in the outcome").  But Henyard cannot show a reasonable probability that he was prejudiced by his trial counsel's advice not to testify.  The evidence against Henyard was considerable, including several witnesses, identifications in and out of court, and physical evidence.  As noted, Henyard has not indicated what the substance of his testimony would have been, and "[t]his omission, coupled with the overwhelming evidence of [Henyard's] guilt, establishes that any error causing him not to testify was harmless." *Taylor*, 128 F.3d at 1109; *see also Mitchell*, 817 F.3d at 539-40 ("Mitchell also fails to show that he was prejudiced ….  To convict for second degree murder under either self-defense or provocation, the

jury would have had to believe Mitchell's version of events. But the forensic evidence

contradicts Mitchell's story."). The lack of prejudice thus precludes federal habeas relief.

It is doubtful that an evidentiary hearing could turn up evidence that would support

Henyard's first and third federal habeas claims. But the point is moot, as Henyard has not asked

for an evidentiary hearing, and the court will not hold a hearing that he has not requested. *See*

*Stewart v. Peters*, 958 F.2d 1379, 1386 (7th Cir. 1992) ("Nor does Stewart ask for an evidentiary

hearing in order to explore, by means of testimony from Stewart and his trial counsel, what

exactly Stewart was told."); *Branion v. Gramly*, 855 F.2d 1256, 1267 (7th Cir. 1988) ("Branion

did not request an evidentiary hearing.").

## Conclusion

For the forgoing reasons, Henyard's federal habeas petition is denied. Habeas Rule 11(a)

provides that the district court "must issue or deny a certificate of appealability [('COA')] when

it enters a final order adverse to the applicant." Regarding the procedurally defaulted claims, the

applicable standard is:

> When the district court denies a habeas petition on procedural grounds
> without reaching the prisoner's underlying constitutional claim, a COA should
> issue when the prisoner shows, at least, that jurists of reason would find it
> debatable whether the petition states a valid claim of the denial of a
> constitutional right and that jurists of reason would find it debatable whether
> the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Anderson v. Litscher*, 281 F.3d 672, 673-

74 (7th Cir. 2002). Regarding the claims decided on the merits, the applicable standard is:

> To obtain a COA under § 2253(c), a habeas prisoner must make a substantial
> showing of the denial of a constitutional right, a demonstration that …
> includes showing that reasonable jurists could debate whether (or, for that
> matter, agree that) the petition should have been resolved in a different
> manner or that the issues presented were adequate to deserve encouragement
> to proceed further.

*Slack*, 529 U.S. at 483-84 (internal quotation marks omitted); *see also Peterson v. Douma*, 751 F.3d 524, 528 (7th Cir. 2014); *Lavin v. Rednour*, 641 F.3d 830, 832 (7th Cir. 2011).

This court's denial of Henyard's federal habeas claims relies on settled precedents and principles. The application of those precedents and principles to Henyard's petition does not present difficult or close questions, and so the petition does not meet the applicable standard for granting a certificate of appealability. The court therefore denies a certificate of appealability.

September 21, 2016

_____
United States District Judge